[Civ. No. 4291.  Second Appellate District, Division Two.—September 29, 1924.]

## CORNELIA WHITE, Respondent, **v.** PEARL M. McMANUS, Appellant.

[1] QUIETING TITLE—PLEADING—CROSS-COMPLAINT.—A cross-complaint is not ordinarily necessary in an action to quiet title, every defendant relying upon his own title being under his answer an actor whose endeavor is to establish his title, but special circumstances may appear in such an action which will make a cross-pleading necessary.

[2] ID.—TITLE—STATUS OF PARTIES LITIGANT.—Where a plaintiff and defendant in a quiet title action to two lots deraign their respective titles from two separate individuals who, with two others, formerly owned the lots, the status of the plaintiff and defendant under their respective deeds depends upon the status of the four predecessors; if the four predecessors were tenants in common, so also are plaintiff and defendant—the record successors to two of them.

[3] ID.—TITLE—STIPULATION—CONSTRUCTION.—In such quiet title action, a stipulation entered into at the trial to the effect that the title to the lots was vested in the four predecessors, but that their respective interests therein could not be determined from the records, is construed to mean that each of the four predecessors had an interest in a title which was vested in all of them together.

[4] ID.—COTENANCY.—In such action, the four predecessors in question were cotenants of the lots in controversy and, so far as their record title is concerned, plaintiff and defendant are likewise cotenants.

[5] ID.—COTENANCY—ADVERSE POSSESSION—FINDING — EVIDENCE.—In such action, the status of the parties litigant being that of cotenants, the finding by the trial court of title in plaintiff by adverse possession is not supported by the evidence.

[6] ID.—COTENANCY—ADVERSE POSSESSION—OUSTER.—As between cotenants it is necessary to the acquisition of title by adverse pos-

1.  Right to affirmative relief on cross-bill in suit to quiet title, note, Ann. Cas. 1917D, 674.  See, also, 5 R. C. L. 672.

6.  Adverse possession by one tenant in common, note, 109 Am. St. Rep. 609.  See, also, 1 Cal. Jur. 542, 544; 7 R. C. L. 844.

Presumption of ouster of one tenant in common from long-continued undisturbed possession of another, note, 10 L. R. A. (N. S.) 185.

session that some act or acts be shown which amount in effect to an ouster of the one by the other from the common property.

[7] ID.—NONEXISTENCE OF COTENANCY—ADVERSE POSSESSION—FINDING—INSUFFICIENCY OF EVIDENCE.—In such action, the evidence is insufficient to establish a title by adverse possession, even if the parties had not been tenants in common.

---

. (1) 32 Cyc., p. 1363.   (2) 38 Cyc., p. 8.   (3) 36 Cyc., p. 1291. (4) 38 Cyc., p. 8.   (5) 38 Cyc., p. 25.   (6) 38 Cyc., p. 21.   (7) 2 C. J., p. 276, sec. 621.

APPEAL from a judgment of the Superior Court of Riverside County.   William H. Ellis, Judge.   Reversed.

The facts are stated in the opinion of the court.

Adair & Winder for Appellant.

O. K. Morton for Respondent.

WORKS, J.—This is an action to quiet title in which there was a cross-complaint.   [1] It is stated in one of the briefs, however, that the pleading mentioned was interposed merely for the purpose of bringing in a new party, and, indeed, that alone could have been its purpose, for a cross-complaint is not ordinarily necessary in an action to quiet title, every defendant relying upon his own title being under his answer an actor whose endeavor is to establish his title (*Wilson* v. *Madison,* 55 Cal. 5; *Bulwer Con. Min. Co.* v. *Standard Con. Min. Co.,* 83 Cal. 589 [23 Pac. 1102]; *Booth* v. *Stow,* 38 Cal. App. 191 [175 Pac. 705]), and the word ordinarily is used by us advisedly, for special circumstances may appear in such an action which will make a cross-pleading necessary (*Winter* v. *McMillan,* 87 Cal. 256 [22 Am. St. Rep. 243, 25 Pac. 407]; *Islais Water Co.* v. *Allen,* 132 Cal. 432 [64 Pac. 713]), but no such circumstances occur in the present instance.   We do not regard these remarks as having any real effect upon the controversy before us, but they are interposed for the purpose of dismissing from consideration various fugitive statements in the briefs, and of clearly narrowing the points involved to the compass they properly occupy, whether, in truth, the cross-complaint be regarded or whether it be not regarded as an actual factor

in the case. On the trial of the action judgment went for plaintiff, quieting her title in severalty to the property in controversy. Defendant Pearl M. McManus alone appeals.

The property involved in the action consists of lots 1 and 4 in a certain block in Palm Springs, according to the map of that town recorded in 1887. These lots, along with other property, were formerly owned by four men, Campbell, Adams, Miller, and McCallum, all of whom, apparently, had departed this life long before the commencement of the present action. The affairs of these men have never been settled, for the reason, it is said in one of the briefs, that the only papers relating to their business were destroyed in the San Francisco fire of 1906. At any rate, and whatever the cause for the circumstance, their respective interests in the lots in question, at the time those interests subsisted, were not ascertained at the trial. On May 18, 1914, respondent took from a successor of Campbell a grant deed to the two lots, which purported to convey the entire title to them. This deed was placed of record on June 6th of the same year. On May 21, 1914, three days after the grant deed to respondent, appellant took from a successor of McCallum a quitclaim deed to both lots. This latter instrument was recorded on July 24th of that year. Thus rested the record showing as to the title of respondent and appellant in 1914, and thus it has rested ever since, but for the decree in the present action. At the trial it was stipulated that on June 1, 1888, the title to the lots was vested in Campbell, Adams, Miller, and McCallum, "but that their respective interests thereto are not disclosed and cannot be determined by the official records on file" in the county recorder's office, and that on December 15, 1921, the interest held by Campbell on June 1, 1888, was "vested of record" in respondent, and the interest held by McCallum on that date was "vested of record" in appellant. The only significance attending the use of the date December 15, 1921, in the stipulation appears to lie in the fact that the paper was dated and the trial of the cause was commenced on that day. The complaint was filed on March 24, 1921.

[2] For reasons which will appear in the sequel it becomes necessary to determine whether under the respective deeds to them respondent and appellant were tenants in

common in the property, and, as respondent was a successor to Campbell and appellant a successor to McCallum, the status of the two parties litigant under the deeds depends upon the status of Campbell and McCallum. Therefore, were these latter two, or, rather, were they, together with Adams and Miller, tenants in common? We thus restate the question for the reason that we have referred only to Campbell and McCallum as being mentioned in the stipulation, while the truth is that both Adams and Miller were by that paper put in the same category with the other two, the rights of some of the parties to the action who are not parties to this appeal having descended from Adams and Miller. Respondent argues, on this head, only the question of which we have made a somewhat summary disposition, that is, she says that she and appellant were not tenants in common of record, although she admits that the four predecessors in interest of all the parties were so related in the title to the property. This ground appears to us to be untenable. It is manifest to us, as we have already observed, that if the four predecessors were tenants in common, so also were respondent and appellant—the record successors to two of them.

The admission of respondent that the four men were owners in common is contained in this statement: "From the stipulation on file in the case at bar, it might be said that on June 1st, 1888, according to the records, Campbell, Adams, Miller, and McCallum were tenants in common of a large amount of land in the Palm Springs Section." We understand the ten last words of this passage as not insinuating that the men were not owners in common of lots 1 and 4, for no property except those lots was mentioned in the stipulation, nor contemplated by its terms. We are not content to leave the question whether the four men were cotenants to rest upon the admission of respondent, as the point is one of at least some difficulty, and something should be said upon it. The stipulation entered into at the trial was to the effect that the *title* to the lots was *vested* in the four, but that their respective *interests* therein could not be determined from the records. This language would appear to mean that the right of each of the men in the property was of equal solemnity, but that they may have had title

respectively either to undivided one-fourth interests or to undivided interests figured in some proportion, as, for instance, that one may have had title to an undivided one-half and each of the others to an undivided one-sixth. This view seems to be demanded by the fact that the word "interest" is used in connection with the terms "title," and "vested." [3] In other words, we take the stipulation to mean that each of the four men had an interest in a title which was vested in all of them together. Not only does this conclusion appear to be required upon principle and from the language employed in the stipulation, but it is supported by the provisions of section 686 of the Civil Code, which brings us even nearer to our goal and which reads, in part: "Every interest created in favor of several persons in their own right is an interest in common, unless acquired by them in partnership, for partnership purposes, or unless declared in its creation to be a joint interest, . . . or unless acquired as community property." While this section was apparently enacted as a guide to the construction of instruments *creating* property rights in several persons, or, at least, while it has been applied to such a purpose in the decisions in which it has been determined to have a bearing, there can be no straining of the legislative intent in employing it as a guide in determining the meaning of the stipulation before us. At any rate, the section affords a basis for the assertion that the four men here in question held the two lots in common, or as partners, or as joint tenants, or as husband and wife. It is an absurdity even to state the last possibility, but it really presents one of the factors of the section. They could not have been joint tenants, for if they were so the entire title would long ago have vested in a survivor of the four, whereas the stipulation is to the effect that the parties here hold the individual interests, respectively, of Campbell and McCallum. The four men could not have held as copartners, for under the stipulation they held individual interests, the title was held by them in *some* proportion as between them, and therefore it was not held by a copartnership. The terms of the paper exclude the idea of a title held by a copartnership. [4] On the whole, we are of the opinion that the four men were co-tenants and that, perforce, so far as their record title is concerned, respondent and appellant are likewise cotenants.

[5] This brings us to what is stated in the briefs to be the ultimate question in the case. Respondent claims title by adverse possession and the findings and judgment uphold the contention. Appellant insists that the finding of adverse possession is not supported by the evidence. We proceed to state all of the record to which respondent may look in an endeavor to uphold the finding. The town of Palm Springs composes what with propriety may doubtless be termed an oasis in the desert. Taking various parts of the record there is testimony to the effect that outside of a few cultivated portions the town consists of sand, greasewood, cactus, and so forth; that there is a little property there that is in alfalfa and under cultivation; that there are many people in the town who have kept Bermuda grass around their places; that many lots owned by nonresidents are covered with debris and tin cans and things the campers leave and have left in years gone by, and that the diameter of the town in the residential part is a half mile each way. We cite this evidence as to the physical features of Palm Springs because of the contention of respondent that the extent and nature of the cultivation and improvement of the two lots in suit necessary to the establishment of a title to them by adverse possession are to be measured by the conditions in that respect about the town.

We now state the particular evidence upon which the finding of adverse possession is based. Lots 1 and 4, although in the same block, are not contiguous. Neither of them has ever been completely fenced or otherwise surrounded by a substantial inclosure. Respondent, referring in the first instance to several lots, among which were 1 and 4, testified: ''Q. On any of these lots . . . what did you do after they were bought? The Court: She said she fenced them. She did not say she fenced 1 and 4. Q. One and four were not fenced entirely? A. No. . . . Q. Have either of these lots 1 and 4 fences on them at the present time? A. They have. Q. On which side? A. 1 has a fence on the south side, and 4 has a fence on the north and south side. . . . Q. Is there a fence at this time on the Main street [west] side of Lot 4? A. Only partially. Q. And it is open? A. The rest of it is open. Q. Has there ever been

a complete fence acro.. the west line on the Main street side? A. No, not that I know of. Q. So that the lot has never been inclosed by a fence? A. Not completely. Q. Is there now a fence along the rear of Lot 4, away from Main street? A. On the east side? A. Yes. . . . ? A. No, due to the washes, it is not wise to put a fence up there. . . . Q. Has there ever been a fence along there? A. No, the washes sweep across there and carry a fence away. . . . I didn't build due to that. . . . Q. How long has the fence been built there between Lots 4 and 3, the north fence of Lot 4? A. About three years—no, longer than that. Q. How long? A. It was there when I went there; in 1913 it was there; how much longer I don't know, I was a stranger. Q. The north fence of Lot 4 was built prior to 1913? A. Before I came to California. . . . Q. Explain the difference between Lot 4, as it is today, and the time when you bought it . . . ? A. It has a new fence on the north side, and it has a new fence on the south side, and a little piece of 7-foot concrete fence wall, it must be 18 inches thick, on the west side. . . . After I bought Lot 4 I saw it under the wash conditions and I did not put . . . any fence on the west or east side, due to the wash that swept across. Q. What did you do; what improvements did you put on? A. Simply to keep the campers off. Q. Keeping campers off is not an improvement. A. It keeps the town looking decent, keeping the tin cans away. Q. What structures? A. I did not put any, due to the fact of the washes that I discovered after I bought it. . . . Q. You entered into an agreement to sell it [lot 4] to Miss Kellogg in 1918? A. Yes, sir. Q. Can you mention any structure of any kind that you put on that property between 1914 and the date you made your contract with Miss Kellogg? A. No." Such is the uncontradicted evidence on the question of "substantial enclosure."

Respondent contends concerning the question of cultivation and improvement of the lots, as already observed, that she performed acts in and about them which, while not showing a cultivation or irrigation of the soil or a planting or growing of any vegetation whatever, do amount to a cultivation and improvement under the conditions prevailing in the village of Palm Springs. Respondent's own testi-

mony concerning these acts follows: "Q. Have these lots been improved more than the adjoining land? A. Yes, sir. . . . Q. Has there ever, to your knowledge, been any cultivation at all of that Lot 4? A. No. Q. During all those years there has never been any plants grown artificially, by irrigation, on 4, except the natural growth of the desert? A. On Lot 1 there has been, but not on Lot 4. . . . Q. From the time you bought this lot [4], up to [1918], the general appearance of Lot 4 was about the same as the surrounding desert? A. No. Q. What was the difference? A. The lot next to it [which was not lot 1] was a good lot and had been used as a truck garden; and Lot 4 was in the wash. . . . Q. With reference to Lot 1, . . . the lot is in a general desert condition, the same condition as lot 4? A. It is a better piece of property. Q. Sand? A. It is not in the wash. It is a little higher up. Q. Is it sand? A. It is all sand; all desert. Q. Is there any greasewood on the lot? A. Yes, sir. Q. Any other plants excepting the natural desert plants? A. No; just natural desert plants. Q. Has Lot 1 been, at any time since you bought it in 1914, under cultivation? A. No. Q. During that period of time, from 1914 to the starting of this action, has lot 1 ever been improved by any building or structure? A. No. Q. During the period from 1914 to 1921, has any work been done on Lot 1? A. Yes, sir. . . . The bushes were pruned up and cleared up. . . . Q. What kind of bushes are they? A. Greasewood, desert bushes, underbrush, mesquite. Q. When was that done? A. Under the supervision of Mr. Strassburg, within the last three years. . . . Q. Was there any pruning done on any of those bushes prior to 1919 or after 1914? A. No, sir. Q. Was any other work done on Lot 1 since 1914? A. No." The testimony of respondent showed that immediately after she took her deed in 1914, which covered also lots 6, 7, 8, and 9 in the same block with lots 1 and 4, she had a survey made of all the lots and had stakes placed at the corners of lots 1 and 4, as well as at the corners of the others. A witness for respondent testified: "Q. What would you say regarding the condition of Lots 1 and 4 . . . between 1914 . . . and March, 1921, as compared to the time prior to 1914? A. I should say a marked condition; a marked improvement; because many of the lots in Palm

Springs, who have nonresident owners, are absolutely covered with debris and tin cans and things campers leave and have left in years gone by. Q. What would you say regarding the condition of Lots 1 and 4 between the years 1914 and 1921 regarding the condition of Lots 1 and 4 and surrounding lots? A. Well, much better, because of the fact, on the Mitchell place where the campers had camped, why, there is a great deal of debris left there every year." The record shows this further testimony of respondent: "What else was done besides surveying? A. Keeping the campers off and cleaning up the lot and keeping it in order. . . . Q. At any time was anything done by yourself as to people cutting wood on either of Lots 1 and 4? A. Number one was trimmed up. Q. As to allowing people to cut wood? A. No; no campers were allowed to cut any wood or to come there. Q. Who prevented them . . . ? A. I did, I looked out for that? . . . Q. Have you put campers off those lots? A. I have. . . . I have never allowed any campers on there any time of the year; all the year round I keep them off." Respondent's sister testified, speaking of lots 1 and 4: "Q. In order to keep the campers off, the owner had to be quite active, or the one in possession, didn't they? A. Yes, sir. Q. And watch the land pretty closely? A. Yes, sir; because they came in the night many nights." We return to the testimony of respondent: "Q. From time to time, did you ever hire any men to do any work on those lots? A. I have. Q. How often? A. Every time I came back to town after the summer vacation I cleaned them up. Q. You state that every season you hired men to do work on those lots? A. Yes, sir. . . . Clean them up and keep the campers off, and keep them in shape. . . . Q. How frequently were you compelled to pick up tin cans on Lot 4? A. Every season when I come back from the summer season. Q. Once a year you would have the cans picked up? A. After that I would keep them picked. They would drift in the summer-time; Mexicans going through. . . . [I picked up] any rubbish the Mexicans, or campers through the desert, would bring. . . . Q. Did you at that time [1914] make any declaration regarding your purchase of those lots [one and four]? A. I did. Q. More than to one or two people? A. To the majority of the town [the population of which then was,

according to some of the testimony, about twenty-five people, including appellant]." This evidence upon the question of repute was allowed by the trial court over the objection of appellant. The record shows that respondent never told appellant that she claimed title to the lots in severalty, although they frequently visited in the homes of each other, and appellant testified, without contradiction, that she never heard of such a claim until in 1918, in connection with the improvement of lot 4, by Miss Kellogg, now to be mentioned. This individual in that year took a conveyance from respondent to that lot and immediately thereafter erected apparently valuable improvements upon it.

The parts of the record above set forth, culled from a mass of similar testimony, show fairly the nature of the evidence upon which was based the finding of adverse possession. To our minds it is utterly insufficient as a support for the first requisite to the establishment of a title by adverse possession in favor of one tenant in common and against another. [6] As between cotenants it is necessary to the acquisition of such a title that some act or acts be shown which amount in effect to an ouster of the one by the other from the common property. This rule is well settled by many cases, one of the last in which it has found expression being *Akley* v. *Bassett,* 189 Cal. 625 [209 Pac. 576]. We find nothing in the record here to satisfy the rule in question. Really, we find nothing in the acts of respondent at any time in excess of about three years before the commencement of the action which shows a marked, if any, departure from the attitude which might reasonably be expected from a tenant in common of property by his cotenant. Certainly, there is not, in our opinion, any evidence whatever, before that period, of an intent to oust the cotenant.

[7] Having reached this conclusion, we state with great brevity our view that the evidence is entirely insufficient to establish a title by adverse possession, even if the parties had not been tenants in common.

Judgment reversed.

Finlayson, P. J., and Craig, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 28, 1924.